[Cite as *State v. Tisdale*, 2026-Ohio-2567.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

ELVIN R. TISDALE,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 CO 0024**

---

Criminal Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 2023 CR 39 B

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Vito J. Abruzzino,* Columbiana County Prosecuting Attorney, *Atty. Steven V. Yacovone,* Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Martin S. Hume*, Martin S. Hume Co., L.P.A., for Defendant-Appellant.

Dated: July 1, 2026

**Robb, J.**

{¶1}   Defendant-Appellant Elvin R. Tisdale appeals his convictions entered after a jury trial in the Columbiana County Common Pleas Court.  He sets forth six assignments of error raising arguments on suppression, speedy trial, prosecutorial misconduct, confrontation clause, ineffective assistance of counsel, and cumulative error.   For the following reasons, Appellant's convictions are upheld, and the trial court's judgment is affirmed.

STATEMENT OF THE CASE

{¶2}   On July 15, 2021, just before 1:00 a.m., multiple shots were fired at a group of males who were socializing on the front porch of an East Liverpool house in an area known as the East End.  Brycen Douglas, age 20, died on the porch from a gunshot wound to the neck.

{¶3}   On January 11, 2023, Appellant was indicted for aggravated murder in violation of R.C. 2903.01(A) (purposely with prior calculation and design) and murder in violation of R.C. 2903.02(A) (purposely).  Each count was accompanied by a firearm specification under R.C. 2941.145(A).  Appellant was also charged with having weapons while under disability (due to a 2016 drug trafficking felony conviction in Columbiana County).  R.C. 2923.13(A)(3),(B) (a third-degree felony).

{¶4}   At the June 2025 jury trial, the forensic pathologist testified the bullet entered the left side of the victim's neck, traveled horizontally while dropping slightly, and exited the right side of his neck.  (Tr. 524-527).  The wound showed no evidence of a gun being fired from nearby (no stippling which can occur within eighteen inches of the muzzle). *Id.* at 532.

{¶5}   A resident of the targeted house testified she was on the porch with her brother and his friends.  She retreated into the house after the group seemed nervous about safety due to a prior homicide and concerns of retaliation.  During the shooting, some of the group took cover in the house where she was making popcorn with her two-year-old child.  She noted one of the males who did not seek shelter in her house was older than the others.  *Id.* at 299-305.  He was believed to be the main target of the

Case No. 25 CO 0024

shooting (target A) as he was a suspect in the homicide of Dion McMillon occurring less than two months earlier. *Id.* at 305, 480, 721.

{¶6} One of the guests of the resident's brother testified he was approaching an empty car in front of the house at the time of the shooting. He noticed there were no cars driving on the street at the time. He also attested no shots were fired from the porch of the house he was visiting. *Id.* at 342-343.

{¶7} The first responding officer testified to arriving at a hectic scene with the surviving males hysterical and unable to provide suspects for dispatch while other jurisdictions were summoned to assist. *Id.* at 320-322. Two witnesses approached declaring a person called "Ju" drove around the area in a dark-colored vehicle prior to the shooting. The officer knew this was the nickname of Curtis Holland, who was Appellant's associate. *Id.* at 322-323.

{¶8} A BCI agent testified to collecting evidence at the scene, including bullet fragments from the porch under the suspected impact marks on the house. *Id.* at 442-447. Seven bullet casings were found in a narrow gap between two houses across the street (at a diagonal distance) from the target house. *Id.* at 435-436. This agent created a cast from a footwear impression found near the casings. *Id.* at 441.

{¶9} Another BCI agent testified the bullet casings were from a 9mm Luger but were fired from two separate guns. Based on his analysis of the firing pin impressions, he separated the casings into a group of three fired from one gun (with a D-shaped firing pin) and a group of four fired from a different gun (with a round firing pin). *Id.* at 464-466 (playing his video deposition).

{¶10} A crime scene reconstructionist from the Ohio State Highway Patrol testified about evidence of fresh bullet marks on the house with defects showing a strike trajectory consistent with the angle coming from the area where the casings were recovered. (Tr. at 377-384, 419). He explained the ejection of casings from a firearm (to the right from a 9mm) can travel feet through the air or bounce off objects (and can be kicked or land on clothing and then fall off while moving). *Id.* at 388-389, 408-412, 416. He took photographs and made a diagram of the scene.

{¶11} An assisting detective obtained security video from a house near the scene, which showed a vehicle entering and exiting a street behind the houses across the street

from the target house immediately before and immediately after the shooting (St.Ex. 52). *Id.* at 475-478, 725-734. Later, this witness extracted data from a cell phone seized from Appellant (St.Ex. 53, 55, 57) and from a cell phone seized from Allen Tisdale (St.Ex. 54, 56). *Id.* at 470-471, 481-485, 492.

**{¶12}** The law enforcement officer who executed the search warrant to seize this phone from Appellant (St.Ex. 53) testified to also executing a warrant to seize Appellant's DNA sample. *Id.* at 497-502. The phone physically seized from Appellant had service through T-Mobile while his unrecovered other phone had service through Verizon. *Id.* at 741-742, 766

**{¶13}** A BCI forensic scientist testified the bullet casings were swabbed for DNA; he noted the difficulty in obtaining a profile due to the high heat generated during the firing of a gun. *Id.* at 608, 618. A single source male profile was recovered from the swab and found to be sufficient for comparison. *Id.* at 610-611. When the DNA was run through the government DNA database (CODIS), it returned a match for Appellant Elvin Tisdale. *Id.* at 612. The match was confirmed with the DNA sample taken from Appellant through the aforementioned search warrant. *Id.* at 613.

**{¶14}** The estimated frequency of occurrence was rarer than one in one trillion unrelated individuals (with one trillion being BCI's reporting threshold at which the calculation is stopped to make it understandable, even though Appellant's statistic was even rarer than this). *Id.* at 615-616. The scientist pointed out he would not expect to receive an additional person's sample from law enforcement for testing since the swab from the casings contained only a single source and that source already matched Appellant's profile. *Id.* at 618-619, 636. He explained no two people have the same DNA except identical twins and the process of matching DNA is different from the process of determining similarities between relatives (which entails an "unrelated stat"). *Id.* at 617, 646, 652-653, 657-658.

**{¶15}** Allen Tisdale, who was originally indicted as a co-defendant, testified his mother was Appellant's cousin. He said he regularly spent time with Appellant, another cousin named Curtis Holland (aka Ju), and Travis Kidder. *Id.* at 554-555. Their friend, Dion McMillon, was killed two months prior to the shooting of Brycen Douglas. *Id.* at 553. In speaking to the police, Allen initially denied knowing who killed Brycen, but he was

arrested in March of 2024 in connection with Brycen's death. Eventually, he informed his mother and his attorneys that he knew what happened on the night Brycen was killed. In December 2024, his attorneys arranged for him to relate the events to the prosecution. *Id.* at 557-562. Allen thereafter entered an agreement wherein he pled guilty to lesser charges and agreed to testify truthfully. *Id.* at 556, 561.

{¶16} According to Allen's testimony, on the evening of July 14, 2021, Kidder drove him and Holland around in a black Nissan while they smoked marijuana and listened to music. *Id.* at 563-564. When they stopped in front of the East Liverpool house where Brycen would later be shot, Holland exchanged unfriendly words with people who were on the porch, especially with target A. *Id.* at 564-566, 568. They then drove to Appellant's house. Allen said he thought Appellant wanted to join their "smoke ride" but soon learned Appellant wanted to join Holland in shooting at target A. *Id.* at 567-568. They switched from the black car to the SUV parked in front of Appellant's house (with Kidder continuing to be the driver). *Id.* at 568. Allen believed the SUV may have been dark gray in color. *Id.* at 589.

{¶17} Upon arriving at target A's location, Kidder parked in an alley running behind the houses across the street from the targeted house and remained in the vehicle. Appellant and Holland put on masks. They gave Allen a mask and instructed him to be their lookout by standing near the back of the gap between the houses while they traversed that gap in order to shoot at the people on the porch at the target house. *Id.* at 569-570. Allen attested he was not armed but Appellant and Holland each had a 9mm handgun. Allen said he saw them shooting at the target house and believed they each fired three shots. *Id.* at 571-572.

{¶18} After they returned to the SUV, Kidder drove out of the alley "real slow, like casual" so as not to look suspicious. *Id.* at 574. Appellant directed Kidder to a house where he believed someone could help them dismantle the guns and where Appellant spoke to "an older dude, white, with gray hair." *Id.* at 573-575. Next, they drove to the house of another cousin (R.T.) in downtown East Liverpool where the three who exited the vehicle for the shooting "took hour-long showers and burnt the clothes that we wore" (including their boots) in the fire pit in the backyard. *Id.* at 575-576. On cross-

examination, the defense asked Allen why his girlfriend told the police he shot Brycen to which he answered his girlfriend misinterpreted what he told her. *Id.* at 577-578.

**{¶19}** A witness who lived very close to the homicide scene (neighbor) described Appellant as one of his best friends. He testified Appellant called him after the shooting, asked whether his security cameras could see cars on the road or alley, and asked him to falsely tell the police Appellant visited his house to drop off money around the time of the shooting. The neighbor refused to provide an alibi, testifying he informed Appellant he did not want involved. *Id.* at 662-667. A few weeks after the shooting, Appellant picked up the neighbor to go to a bar while driving his mother's vehicle, which the witness described as "An SUV, Chevy - - maybe Traverse or Equinox, maybe . . . Like a dark blue." *Id.* at 667. When contacted by the detective, the witness disclosed Appellant's inquiries about the camera and his request for a false alibi. *Id.* at 668, 671. The security video from this neighbor's house was obtained by police. *Id.* at 725.

**{¶20}** Appellant's former girlfriend testified the prior homicide victim Dion McMillon was Appellant's relative. *Id.* at 682. On the night Brycen Douglas was killed, Appellant's girlfriend bartended until 10:00 p.m. and then went for drinks with friends until 3:00 a.m. (more than two hours after the homicide). *Id.* at 683-685. After her night out, she went to Appellant's house to spend the night. He was not home, but she gained entrance through his mother (as Appellant had instructed his girlfriend though texting). *Id.* at 686. Appellant arrived home later, and his girlfriend subsequently heard him discussing the homicide on the phone. *Id.* at 687-688. When the police contacted her to see if Appellant was with her the whole night as he claimed, she told them his statement was untrue. *Id.* at 690-691. She testified to receiving texts from Appellant (St.Ex. 74), which confirmed he was not home or with her in the hours surrounding the shooting. *Id.* at 692.

**{¶21}** The lead detective testified the gap between the houses where the casings were found was 90 feet from the targeted front porch. *Id.* at 714-715. He said the foot impression near the casings was consistent with a Timberland boot (which no officers wore). *Id.* at 716. He testified to the following reasons supporting his conclusion that the motive for the shooting was retaliation for a prior death: Dion McMillon was shot to death two months before and two blocks from the Brycen Douglas homicide; Dion McMillon was related to Appellant, Curtis Holland, and Allen Tisdale; target A was a named suspect in

Dion McMillon's death; and target A was on the front porch prior to Brycen's death. *Id.* at 721-723.

**{¶22}** The detective took the statement of the neighbor, who Appellant called after the homicide to seek an alibi. The neighbor provided the detective with Appellant's Verizon phone number (different than the one associated with the T-Mobile phone physically seized from Appellant and extracted of its data directly). The police never recovered the physical phone associated with the Verizon phone number; however, the detective obtained a search warrant to seize remotely stored Verizon phone data associated with the number (St.Ex. 76). *Id.* at 741-742. From this, he confirmed Appellant placed a call to the neighbor friend approximately six hours after the homicide of Brycen. *Id.* at 743.

**{¶23}** The detective interviewed Appellant in October 2021, after his T-Mobile phone was seized. Appellant claimed it was his only phone. *Id.* at 754. Appellant was sympathetic about the death of Brycen Douglas and upset about the death of his cousin Dion McMillon. *Id.* at 755, 762. He inquired why they thought Brycen's homicide was retaliatory if Brycen was not involved in the McMillon homicide. *Id.* at 755. When asked where he was on the night of the Brycen homicide, he said he was probably drunk at his house or with a "whore." *Id.* at 756-757. Eventually, Appellant specified he was very confident he was home with his girlfriend (who denied this). Appellant then told the detective he did not have the girlfriend's phone number; however, it was found stored in his T-Mobile phone. *Id.* at 758-759.

**{¶24}** Appellant told the detective he was not near the East End on the night of the homicide and was not riding around with his cousins. *Id.* at 760-761. However, the extraction from the T-Mobile phone showed texts to his girlfriend saying he was with his cousins around 11 p.m. (St.Ex. 74) and location data from the service providers indicated both of Appellant's phones were in the East End during the time of the homicide (along with Allen Tisdale's phone). *Id.* at 757, 761, 772-773, 790-804.

**{¶25}** The detective noted the warrant for Appellant's DNA was obtained after BCI recovered the single profile from the casings and this profile was matched to Appellant's DNA in CODIS; after this, there was no longer a need to send other suspect's DNA profiles. *Id.* at 745-748. Before finding out his DNA was recovered at the scene, Appellant

told the detective he had not touched a firearm *or ammunition* in years, as he was barred by a 2016 conviction from handling a firearm. *Id.* at 761-762. A certified copy of the prior conviction was admitted for purposes of the having a weapon while under disability charge. *Id.* at 753. When the detective mentioned recovering Appellant's DNA, Appellant said he must have a twin some place. *Id.* at 763.

{¶26} Appellant admitted to the detective that he usually drove his mother's 2019 Chevy Equinox. *Id.* at 759. He claimed his mother was in New Jersey on the night of Brycen's homicide (however, Appellant's mother let the girlfriend into his house that night just as Appellant's 2 a.m. text said she would). *Id.* at 760, 776.

{¶27} The detective concluded the brake lights, markings, and shape of the vehicle Appellant regularly drove were consistent with the vehicle depicted in the security video recovered from the neighbor's house near the crime scene. *Id.* at 729-734. He pointed out a half hour prior to the shooting of Brycen Douglas, the suspect's vehicle was first spotted driving around the area. During that time, a light glowed from the backseat at the precise time Appellant received a text from his girlfriend. *Id.* at 732, 779.

{¶28} At 12:45 a.m., the vehicle returned to the area, turned onto the street where the camera was located, and then turned onto a street behind the houses where the casings were found. The vehicle remained off camera for eight minutes. After the shooting, the vehicle returned to the street where the camera was located and drove away from the scene. *Id.* at 733-734.

{¶29} The detective recovered a different neighbor's security recording that captured the sound of the gunfire (St.Ex. 95). He described some of the shots as overlapping each other, indicating there was more than one firearm. *Id.* at 736. After listening to the shots many times, including in slow-speed, the detective discerned seven shots were fired. *Id.* at 738.

{¶30} In addition, the detective confirmed other information provided by Allen Tisdale. For instance, he viewed the house where they went to dispose of the guns and matched the phone number of a man who lived there to a number called by Appellant's Verizon phone after the homicide. *Id.* at 783-785. The detective also confirmed there was a fire pit behind R.T.'s house (where Allen said the clothes were burned). *Id.* at 787. Text messages from the T-Mobile phone extraction (St.Ex. 57) showed Appellant's phone

reporting to R.T.'s phone that he would arrive at his house soon and then announcing "here" when he arrived not long after the homicide. *Id.* at 789.

**{¶31}** The jury found Appellant guilty as charged. The state elected to proceed to sentencing on the aggravated murder count after agreeing the murder count was an allied offense of similar import in this case and thus subject to merger. The trial court imposed a sentence of life without parole plus a three-year term for the firearm specification and a consecutive sentence of thirty-six months for having a weapon while under disability. (7/1/25 J.E). The within timely appeal followed.

SUPPRESSION

**{¶32}** Appellant sets forth six assignments of error, the first of which contends:

"THE TRIAL COURT ERRED IN FAILING TO SUPPRESS APPELLANT'S VERIZON CELL PHONE RECORDS WHICH WERE UNLAWFULLY SEIZED IN VIOLATION OF HIS FOURTH AMENDMENT RIGHTS."

**{¶33}** "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. As the trier of fact occupies the best position to resolve factual questions and evaluate witness credibility, we accept the factual basis for the trial court's findings if supported by competent, credible evidence. *Id.* We then independently determine as a matter of law, without deference to the trial court, whether the facts satisfy the legal standard. *Id.*

**{¶34}** Pursuant to the Fourth Amendment, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." In asserting a Fourth Amendment violation, the defendant must show a reasonable expectation of privacy; the expectation must be justified under the circumstances when viewed objectively. *State v. Diaw*, 2025-Ohio-2323, ¶ 12, quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979), quoting *Katz v. United States*, 389 U.S. 347, 353 (1967). In *Katz*, the Court held the defendant had a reasonable expectation of privacy in the *content* of private phone communications. *Katz* at 353-359 (electronic listening device in a public telephone booth).

**{¶35}** Under the third-party doctrine, "a person has no reasonable expectation of privacy in information that he or she voluntarily turns over to third parties" and thus "takes the risk that the information will end up in the hands of the government." *Diaw* at ¶ 16-21, citing *Smith* at 743-744 (warrant not required for phone company's pen register, record of numbers dialed) and *United States v. Miller*, 425 U.S. 435, 442-443 (1976) (depositor risks numerical information will be conveyed by the bank to the government).[1]

**{¶36}** On the subject of cell site location information (CSLI), the FBI once asked for five months of CSLI from the defendant's service provider and seven days from a roaming provider, but the warrant was unconstitutionally issued on a finding of a standard less than probable cause. *Carpenter v. United States*, 585 U.S. 296, 302 (2018). The government argued and the appellate court agreed there was no reasonable expectation of privacy in this information voluntarily provided to the service provider. *Id.* at 303. However, the United States Supreme Court ruled the third-party doctrine inapplicable by emphasizing the "large swath of location information that [the defendant] did not voluntarily convey" to the provider (as the conveyance happens automatically) and by finding a person maintains a legitimate expectation of privacy in the historical record of "the whole of his physical movements" captured by CSLI. *Id.* at 310, 313, 315-316.

**{¶37}** As emphasized by the Ohio Supreme Court, the *Carpenter* holding was narrow and careful not to disturb *Smith* and *Miller*, which respectively held a warrant was not required to obtain a record of numbers dialed from a phone or monetary information turned over to a third party. *Diaw* at ¶ 24, 28, 30, citing *Carpenter* at 308, 316 (the doctrine that a defendant lacks an expectation of privacy in information voluntarily turned over to third parties "remains true" and "the Government is typically free to obtain such information from the recipient without triggering Fourth Amendment protections"); *see also United States v. Clenney*, 631 F.3d 658, 666 (4th Cir. 2011) ("phone customers have no constitutionally cognizable privacy interests in basic subscriber information"). Applying the third-party doctrine, the Ohio Supreme Court concluded a warrant was not required

---

[1] Cases about a physical phone being confiscated from an arrestee and digitally examined without a warrant are not decided under the third-party doctrine. *See, e.g., Riley v. California*, 573 U.S. 373, 400 (2014); *State v. Smith*, 2009-Ohio-6426, ¶ 29; *compare State v. Diaw*, 2024-Ohio-2237, ¶ 40 (10th Dist.) (rejecting the applicability of *Riley* to the service provider's records), *aff'd*, 2025-Ohio-2323 (upholding warrantless seizure of single CSLI coordinate from downloaded app).

to obtain the defendant's CSLI for a mere two-day historical period at a specified public place from the Letgo app, which the defendant voluntarily downloaded and used to sell items. *Diaw* at ¶ 31-37 (suggesting 28 days may be too long).

**{¶38}** Nevertheless, a warrant on probable cause is required to obtain from a service provider's past cell phone location records spanning multiple weeks chronicling a subject's daily physical presence. *Carpenter* at 314-316 (stating this was qualitatively distinct from call logs). Here, the range of time for records seized from Verizon was May 23, 2021 to July 23, 2021, but the search warrant for these records associated with Appellant's phone number was issued upon probable cause.

**{¶39}** Appellant seeks to invalidate the search warrant and exclude the cell phone records because the warrant was issued by a municipal court judge who ordered the detective to seize records at a service provider whose legal compliance office was located in New Jersey. It was undisputed the municipal judge was authorized to issue search warrants and the murder occurred in the judge's territorial jurisdiction (where the most relevant CSLI data was generated). In moving for suppression, Appellant disputed the authority of the municipal court to include in the warrant items protected by the Fourth Amendment where those items were to be obtained from a company that listed an out-of-state address for warrant requests.

**{¶40}** The introduction to the warrant recited: "Municipal Court East Liverpool . . . As Judge of the above Court of record, I hereby command you to search within the jurisdiction of the Court in Columbiana County, Ohio . . . Verizon Wireless, 180 Washington Valley Rd. Bedminster, NJ 07921, and seize the following property . . ." After reciting a specified Verizon phone number, the warrant listed requests for the following items: customer information; call detail records (including texts, MMS messages, and data activity); cell site information and associated cell site locations; GPS-related tracking; pen register data; other location information with longitude and latitude received by towers (timing and triangulation); and text or MMS messages stored in the normal course of business (including on the cloud). (21 SW 28, 9/2/24).

**{¶41}** In denying Appellant's motion to suppress, the common pleas court rejected Appellant's argument that suppression of the cell phone records was automatically required because a municipal court judge lacks authority to issue a warrant to be executed

outside his territorial jurisdiction. The trial court noted where a municipal court issued a warrant to seize a parcel in a different city, it was merely a non-fundamental violation of Crim.R. 41, rather than a constitutional violation requiring exclusion. (12/4/24 J.E.), citing *State v. Hardy*, 1998 WL 543368, *4-5 (2d Dist. Aug. 28, 1998), applying *State v. Wilmoth*, 22 Ohio St.3d 251, 262-264 (1986).

**{¶42}** In the cited Supreme Court case, the Court did not require suppression where the police failed to submit a written affidavit to obtain the warrant, as required by Crim.R. 41(C), and failed to testify under oath as constitutionally required. Initially, the Court reviewed how Crim.R. 41 violations were analyzed, stating a "fundamental violation" was one of constitutional magnitude as opposed to a non-fundamental violation. *Wilmoth* at 262-264 (confirming "the exclusionary rule will not ordinarily be applied to evidence which is the product of police conduct violative of state law but not violative of constitutional rights"). A fundamental violation rising to the level of a constitutional violation was subjected to automatic suppression while a non-fundamental violation resulted in exclusion only in rare cases where the defendant was prejudiced such that the search or extent of the search might not have otherwise occurred or there was deliberate disregard for the rule. *Id.* The Court then found the lack of written affidavit was not a fundamental violation and was not intentionally violative or prejudicial. *Id.* at 264. Adopting the good faith exception, the Court held, even assuming the faulty oral oath given by a magistrate was a constitutional violation, the good faith exception ("recently modified" in *Leon*) was an available doctrine to avoid the application of the exclusionary rule. *Id.* at 254, 264-267, adopting *United States v. Leon*, 468 U.S. 897 (1984).

**{¶43}** Applying these tests, the trial court emphasized the warrant for Appellant's Verizon phone records was issued by a neutral and detached judge, described the phone number and data with particularity, and was based upon probable cause in a valid affidavit. The court then concluded the asserted violation was non-fundamental and the exclusionary rule was thus not triggered. (12/4/24 J.E.).

**{¶44}** Appellant contends the *Wilmoth* case is distinguishable because the warrant here was recognizable as violating Crim.R. 41 on its face as New Jersey was obviously not in the municipal court's territorial jurisdiction. The cited portion of the rule provides: "Authority to Issue Warrant. Upon the request of a prosecuting attorney or a

law enforcement officer: (1) A search warrant authorized by this rule may be issued by a judge of a court of record to search and seize property located within the court's territorial jurisdiction . . ." Crim.R. 41(A) (or to install a tracking device in the court's territorial jurisdiction regardless of whether the subject then leaves the jurisdiction).

**{¶45}** Appellant points to a case, subsequent to *Wilmoth,* where the Court required the suppression of evidence because the search warrant was not signed by a judge and void ab initio. *State v. Williams*, 57 Ohio St.3d 24, 25-26 (1991) (otherwise, a person would be left to guess whether it has become an official search warrant because the only identifiable objective manifestation of a judge's subjective intent to issue a search warrant was missing). In *Williams*, the Court provided examples of important documents that require signatures and reasoned a defendant's Fourth Amendment rights should not be granted less protection than property rights; thus, "it is necessary to require the signature of the issuing judge on a search warrant prior to the search to protect this constitutional right." *Id.* at 26 (without mentioning *Wilmoth* or the good faith exception to the exclusionary rule, which were discussed by the dissent).

**{¶46}** Appellant argues the evidence in his case should likewise be automatically suppressed, claiming the good faith exception cannot be considered under the circumstances before us. However, an unsigned warrant is not akin to the situation here (where the detective requested a company operating within the city limits but with an out-of-state compliance office to comply with a search warrant for electronic records that can be accessed remotely). We also note the *Williams* case was not cited below where Appellant relied on Second District cases including the one applied by the trial court. Appellant argues the trial court should have applied a later Second District case specifically addressing a search warrant issued by a municipal court judge for electronic data where the entity with access to the defendant's stored data had an address outside of the state. *State v. Worthan*, 2024-Ohio-21 (2d Dist.).

**{¶47}** In *Worthan*, the Second District noted the phone was never found, the detective believed the data was stored in Florida, and the data was not obtained from Ohio even if it may possibly be accessible from here. *Id.* at ¶ 14-15, 29. Although the court indicated the detective used the address where AT&T's legal-compliance office was located, the court opined the detective did not testify the Florida address was merely a

"service address" (distinguishing a cited Tennessee appellate case). *Id.* at ¶ 1, 8, 22. The court also believed a warrant is not executed by the detective's act of sending (from the territorial jurisdiction of the issuing court) to wherever the receiving company may be (rejecting a cited New York trial court case saying the opposite). *Id.* at ¶ 16. The court concluded the warrant was executed when AT&T searched their computers and storage devices, opining the data retrieval involved "searching physical places in Florida." *Id.* at ¶ 26.

{¶48} The *Worthan* court then acknowledged the detective could have secured a search warrant from an Ohio *common pleas court* because the federal Stored Communications Act (SCA) extends the geographic jurisdiction of a court by allowing a state "court of competent jurisdiction" to issue an out-of-state warrant for cell phone data. *Id.* at ¶ 19-21, citing 18 U.S.C. 2703 and 18 U.S.C. 2711(3)(B) (defining "court of competent jurisdiction" as including "a court of general criminal jurisdiction of a State authorized by the law of that State to issue search warrants"). We previously observed this federal law allowed a common pleas court in Mahoning County to issue a search warrant to Instagram at its California office. *State v. Bo*yd, 2023-Ohio-4725, ¶ 63, 68-69 (7th Dist.) (in dicta, as the issue was not properly raised in a post-conviction relief petition as the suppression record contained the warrant).

{¶49} "Although an Ohio municipal court is authorized by Ohio law to issue search warrants, it is a court of limited criminal jurisdiction, not general criminal jurisdiction." *Worthan*, 2024-Ohio-21, at ¶ 20 (2d Dist.), citing *State v. Zima*, 2004-Ohio-1807, ¶ 14 (involving the effect of a plea on municipal charges). The Second District said the municipal court warrant was deficient on its face because it authorized a search in the territorial jurisdiction but Florida was not in the court's territorial jurisdiction (and the federal act would not cover municipal courts). *Id.* at ¶ 29.

{¶50} Notably, the *Worthan* court declared *the state was only arguing* no violation occurred at all because the municipal court possessed authority to issue the warrant. *Id.* at ¶ 2, 9, 13, 25 (where the trial court held the violation of Crim.R. 41(A) was a fundamental violation requiring suppression). The appellate court *said the state did not challenge* the trial court's determination that a fundamental violation of Crim.R. 41(A)(1) would require suppression of the evidence, argue the violation was non-fundamental, or

raise the good faith exception. *Id.* Concluding the warrant was invalidly issued by a municipal court beyond its jurisdiction, the *Worthan* court upheld the trial court's decision suppressing the evidence. *Id.* at ¶ 3, 32.[2]

**{¶51}** Distinctly, the state here alternatively argued any violation was non-fundamental and the good faith exception applied. The state also argues harmless error based on overwhelming other evidence at trial (whereas *Worthan* was a state's appeal before trial). Moreover, the detective in the case before us did not express a belief that Appellant's data was stored at the New Jersey address Verizon used for responding to warrants.

**{¶52}** At the suppression hearing, the detective testified the police use a program (ZetX) to input a phone number in order to ascertain the service provider, where to send a preservation request or warrant, and the name of the customer (sometimes). (Supp.Tr. 11, 17, 20). The detective specifically said he did not send the warrant to the location under a belief the records were stored there. *Id.* at 20.

**{¶53}** He pointed out the police never found the physical phone, the murder was committed in territorial jurisdiction of the court where he was a city detective, and the witness who gave him Appellant's phone number lived in the same territorial jurisdiction. *Id.* at 11, 13-14, 22 (the neighbor of the targeted house provided the number from which Appellant called after the murder to ask for a false alibi by stating Appellant was at his house at the time of the murder). The detective additionally emphasized a customer can enter the Verizon store within the territorial jurisdiction of this municipal court[3] and obtain copies of their electronically stored records. *Id.* at 16. He attested he had no reason to believe the search warrant was invalid, noting he followed standard law enforcement

---

[2] The SCA has an exclusivity of remedies clause without exclusion of evidence as remedy for a violation. 18 U.S.C. § 2708. Appellant, like the *Worthan* court, focuses on Crim.R. 41(A), which applies to all Ohio courts in saying they may issue search warrants for property located in their territorial jurisdiction. It could be theorized that if the federal act can expand the territorial jurisdiction of a common pleas court contrary to the terms of a rule like 41(A), then such portion of the rule must not be a fundamental matter of *constitutional* magnitude or must not be so destructive that suppression is automatic.

[3] Defense counsel on appeal says the local store was actually located in Calcutta rather than the city of East Liverpool. However, Calcutta is located in St. Clair Township. At the time of the 2021 search warrant, the East Liverpool Municipal Court had territorial jurisdiction over the city of East Liverpool *plus St. Clair Township* and Liverpool Township. Former R.C. 1901.02(B). (Thereafter, effective 9/23/22, the East Liverpool Municipal Court was incorporated into the Columbiana County Municipal Court. R.C. 1901.01(A),(C) and 1901.02(A),(B).)

protocol and in his many years as a police officer, every time he sought a warrant for Verizon the compliance office he used was out of state.  *Id.* at 19-20.

**{¶54}**  The detective also pointed out a service provider generally deletes location data after a certain period; however, he immediately sent a preservation letter to Verizon to ensure the data was not purged while he was obtaining a search warrant.  He testified to confirming the data related to Appellant's phone number thus remained preserved in the provider's system (and was available if another search warrant were to be issued by the judge of the common pleas court on the day of the suppression hearing).  *Id.* at 12-13.

**{¶55}**  In presenting arguments at the suppression hearing, the prosecutor pointed out at the time the detective executed the warrant, the Second District's *Worthan* case was not in existence so as to provide notice to the police a warrant issued by a neutral judge upon probable cause may be improper for the reasons expressed in the opinion. *Id.* at 31.  It was noted Verizon, as a multijurisdictional company, conducts business in and also has an office in the municipal court's jurisdiction (inside which records could be downloaded for customers by employees) but instructs law enforcement to direct requests elsewhere.  *Id.* at 28-29.

**{¶56}**  The state's brief emphasizes a recent Fifth District case where Dropbox referred the defendant's account for investigation due to three incriminating files including a video of a man engaged in sexual conduct with a prepubescent female child.  *State v. Wharton*, 2025-Ohio-4485, ¶ 4 (5th Dist.).  A county sheriff's department detective (in the Ohio county where Appellant was a registered sex offender) sent a letter of preservation to legal counsel for Dropbox at a headquarters in California.  *Id.* at ¶ 5-6 (noting customer files are kept on secure storage servers in many states).  He then obtained a search warrant, on January 8, 2024, from the local municipal court for the defendant's electronically stored records kept by Dropbox.  At the time, it was department policy to submit these warrant requests to the municipal court.  *Id.* at ¶ 6.  After the warrant was issued, the municipal court learned of the January 5, 2024 *Worthan* case out of the Second District and the department policy was modified to instruct officers to submit warrant requests to the common pleas court.  *Id.* at ¶ 6, 16.  After his suppression motion

was denied, the defendant pled no contest and appealed relying on the out-of-district *Worthan* case. *Id.* at ¶ 9-15.

**{¶57}** Noting the Second District case was not binding, the Fifth District agreed federal law required a search warrant for out-of-state electronic records to be issued by a court of general criminal jurisdiction but the municipal court, as a court of limited jurisdiction, lacked authority to issue such warrant. *Id.* at ¶ 15. However, the Fifth District pointed out, "when police act in an objectively reasonable manner in executing a search believed in good faith to be legal, there is no bad conduct to deter" and found the good faith exception to the exclusionary rule was available to the state. *Id.* at ¶ 17, quoting *State v. Dibble*, 2020-Ohio-546, ¶ 16.

**{¶58}** The quoted Ohio Supreme Court case also held, "the exclusionary rule should not be applied in situations in which an officer has relied in good faith on a warrant issued by a neutral and detached magistrate or judicial officer, notwithstanding the fact that the warrant is later found to be invalid." *Dibble* at ¶ 17-18, citing *Leon* 468 U.S. at 913, 919 (as the exclusionary rule's purpose is to deter unlawful police conduct, evidence is suppressed "only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment"). The Ohio Supreme Court previously applied the good faith exception when police relied on a warrant later determined to be invalid because municipal clerks had been flagrantly violating the Fourth Amendment after receiving instructions that a probable cause review was not required and the affidavit in fact lacked probable cause. *State v. Hoffman*, 2014-Ohio-4795, ¶ 42, 45-46 (pointing out this affidavit form was previously upheld by the appellate district in the officer's district), citing *Wilmoth*, 22 Ohio St.3d 251 and *State v. George*, 45 Ohio St.3d 325 (1989) (holding the appellate court improperly substituted its judgment for the trial court on good faith).

**{¶59}** Considering *Dibble*, *Wilmoth*, and other Ohio Supreme Court case law applying *Leon*'s good faith exception, the Fifth District concluded the evidence seized from the defendant's Dropbox account under a municipal court search warrant to an out-of-state compliance office was not subject to suppression due to the application of the good faith exception to the exclusionary rule. *Wharton*, 2025-Ohio-4485, at ¶ 15, 17 (5th Dist.), *appeal not allowed*, 2026-Ohio-475 (where the prosecutor's memorandum in

response to jurisdiction argued: a mere non-fundamental violation under *Wilmoth*, no prejudice as the common pleas court would have granted the warrant, and the good faith exception applied).

**{¶60}** Likewise, although the Third District concluded a warrant issued by a county court for blood located in a different county was invalid, the court remanded for a determination of whether exclusion was required under a balancing test or whether the good faith exception applied. *State v. Dulaney*, 2013-Ohio-3985, ¶ 20-24 (3d Dist.).

**{¶61}** Furthermore, the Sixth Circuit has concluded *although a warrant may be invalid under state law where a judge in one county lacked jurisdiction to issue a warrant for a residence in another county, the prosecution is permitted to rely on the good faith exception*. *United States v. Master*, 614 F.3d 236, 240-243 (6th Cir. 2010). The court explained prior contrary holdings (saying a search warrant issued by a judge who lacked territorial jurisdiction constituted a void ab initio warrant requiring automatic suppression) are no longer viable under United States Supreme Court law on the good faith exception. *Id.* (benefits of deterrence must outweigh the costs), citing *Herring v. United States*, 555 U.S. 135, 140-146 (2009) (*where police executed a rescinded warrant*, the pertinent analysis of deterrence and culpability was objective, not subjective, and the conduct at issue was not so objectively culpable as to require exclusion), citing *Leon*, 468 U.S. at 923 ("depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid").

**{¶62}** The Tenth Circuit ruled likewise after assuming, *without deciding*, a warrant exceeded the magistrate-judge's jurisdiction because it authorized the search of computers located outside the Eastern District of Virginia and after assuming this violated the constitution or prejudicially violated a law or rule. *United States v. Workman*, 863 F.3d 1313, 1317-1321 (10th Cir. 2017). The court then rejected the defendant's argument that these assumptions would essentially result in a warrantless search that is not subject to the good faith exception. Rather, the court held *the good faith exception in Leon applies to a warrant issued by a judge exceeding his authority by exceeding geographical constraints*. *Id.* at 1317, 1319. The court concluded the executing agents relied on the warrant in good faith, noting the FBI agents were not expected to understand the legal

nuances of a magistrate judge's jurisdiction. *Id.* at 1320-1321 (noting precedent on the nature of the electronic capture location was lacking).

**{¶63}** Considering the foregoing law, we conclude, assuming and to the extent the municipal court exceeded his geographic limits by issuing a search warrant to a company with an out-of-state office for responding to legal documents, this was not a fundamental violation of Civ.R. 41 of constitutional magnitude under the Fourth Amendment but is a non-fundamental violation. *See Wilmoth*, 22 Ohio St.3d at 263-264. The good faith exception to the exclusionary rule applies to a warrant issued by a neutral and detached magistrate upon probable cause in an affidavit where an issuing judge has authority to issue search warrants but allegedly exceeded the judge's territorial jurisdiction in issuing a warrant for records electronically stored by a cell phone service provider (with an office in the court's jurisdiction that does not respond to legal requests).

**{¶64}** The detective was not expected to know the legal intricacies of territorial jurisdiction over cloud services and electronic storage, especially before the issuance of the Second District's *Worthan* case. The issue disputed here was not a specific term specified in the Fourth Amendment. *Compare Groh v. Ramirez*, 540 U.S. 551, 563 (2004) ("Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe a warrant that plainly did not comply with that requirement was valid" where no items to be seized were listed). There was sufficient evidence supporting the trial court's decision, and a court could reasonably find the detective acted in good faith reliance on the warrant when he sent it from the municipal court's jurisdiction to Verizon's legal compliance office. Accordingly, this assignment of error is overruled.

**{¶65}** Alternatively, the state argues even if the cell location data was subject to suppression, the admission was harmless due to the overwhelming other evidence against Appellant. *See State v. LaRosa*, 2021-Ohio-4060, ¶ 36-37 (where certain evidence should have been excluded upon the defendant's suppression motion, the Supreme Court explained the next question is whether the error was harmless). An error that does not affect substantial rights is harmless and must be disregarded. *Id.* at ¶ 37, 40 (state's burden to show harmless), citing Crim.R. 52(A). Before a court can conclude an error affected the substantial rights so as to require a new trial, the court must: (1) find

Case No. 25 CO 0024

the defendant was prejudiced by the error because the error had an impact on the verdict; (2) declare a belief the error was not harmless beyond a reasonable doubt; and (3) excise the prejudicial evidence and determine the remaining evidence does not establish guilt beyond a reasonable doubt. *State v. Harris*, 2015-Ohio-166, ¶ 37, citing *State v. Morris*, 2014-Ohio-5052, ¶ 22-33 (overwhelming remaining evidence could satisfy the third principle).

**{¶66}** Appellant's reply brief mentions the Verizon records allowed the detective to verify the neighbor's statement that Appellant called him after the murder. (Tr. 743). The neighbor provided Appellant's Verizon phone number to the police after informing them Appellant called to ask him to provide a false alibi by saying he was at the neighbor's East Liverpool residence to drop off money and to ask whether his security cameras could see cars on the pertinent roadways. (Supp.Tr. 11); (Tr. 665-666, 671). However, the Verizon records on this topic related to calls dialed, not content. *See Carpenter*, 585 U.S. at 309-310 ("while the third-party doctrine applies to telephone numbers and bank records," it did not extend to historical CSLI chronicling of "the whole of his physical movements").[4]

**{¶67}** Appellant's reply brief also asserts the CSLI evidence showing he was in the vicinity was "crucial" to the state's case. In alternatively arguing harmlessness, the state points to the following overwhelming evidence: a vehicle matching one belonging to Appellant's mother was captured on video arriving before the murder and leaving after the murder (behind the houses where the casings were recovered); Appellant's lookout, who was an eyewitness, testified Appellant and another individual fired the shots; this witness also confirmed they arrived in an SUV that had been parked in front of Appellant's home; Appellant admitted he usually drove his mother's SUV; Appellant's DNA was recovered from shell casings found at the site of the shooting (where casings fired by two different guns were recovered); Appellant sought false alibis from two individuals, asking one about whether his cameras had a view of the road; Appellant showered and burned

---

[4] The *contents* of text messages were used to confirm the testimony of Appellant's girlfriend that he was reporting he was not home during the homicide and his mother was home and to confirm Allen Tisdale's testimony about their arrival at R.T.'s house soon after the homicide. (Tr. at 575-576, 692-693). However, these texts were obtained through the extraction from the physical T-Mobile phone. *Id.* at 758-760, 768-769; (St. Ex. 57) (containing the Cellebrite extraction from the physical phone); (St.Ex. 74).

his clothes after the murder; and Appellant had a motive of retaliation for his cousin's homicide weeks earlier (believed to be committed by a person present on the front porch where the victim died).  *See* Statement of the Case, above.

**{¶68}** Lastly and notably, the detective did not merely use the CSLI from the Verizon phone; he used the CSLI from Appellant's T-Mobile phone as well, which was not related to a municipal court judge's warrant.  This T-Mobile number's CSLI showed the phone pinging off a tower on the East End at 12:18 a.m., 12:41 a.m., and 12:48 a.m. among other times.  (Tr. 801-803).  Appellant's T-Mobile phone was also pinging in the location where Allen Tisdale said they went after the murder.  *Id.* at 804.  Furthermore, Appellant's T-Mobile data was confirmed by Allen Tisdale's CSLI plot as well.  The additional data from Appellant's Verizon phone number would have been harmless.  In any event, there is no need to reach harmless error if there was no suppression error, and as addressed above, suppression was not required.

## EFFECTIVE ASSISTANCE OF COUNSEL

**{¶69}** Appellant raises multiple allegations of ineffective assistance of counsel (in his fifth assignment of error) by incorporating arguments from the remaining assignments of error.  We relocate each allegation of ineffectiveness to the assignment of error containing the relevant content.  However, to set forth the applicable test, we bring forward the fifth assignment of error, which alleges:

"THE APPELLANT'S CONVICTION MUST BE REVERSED BASED UPON INEFFECTIVE ASSISTANCE OF COUNSEL."

**{¶70}** A defendant making a claim of ineffective assistance of counsel must demonstrate "errors on the part of counsel of a nature so serious that there exists a reasonable probability that, in the absence of those errors, the result of the trial would have been different."  *State v. Carter*, 72 Ohio St.3d 545, 557-558 (1995).  This involves a showing of both deficient performance and resulting prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Consequently, if the performance was not deficient, then there is no need to review for prejudice and vice versa.  *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).  In the direct appeal of the criminal conviction, these items must be demonstrated by the record before the court and not based on speculation or proof outside the record.  *State v. Hartman*, 93 Ohio St.3d 274, 299 (2001).

**{¶71}** In evaluating an alleged error said to constitute a deficiency in performance, the court asks whether there was "a substantial violation of any of defense counsel's essential duties to his client" so that "counsel's representation fell below an objective standard of reasonableness." *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), citing *Strickland* at 687-688. Our review is highly deferential to counsel's decisions as there are "countless ways to provide effective assistance in any given case" and there are strong presumptions that the decisions fell within the wide range of reasonable professional assistance. *Id.* at 142, citing *Strickland* at 689. We refrain from second-guessing the strategic decisions of counsel. *Carter* at 558.

**{¶72}** On the prejudice prong, an appellant must show there is a reasonable probability the result of the proceedings would have been different but for the serious errors committed by counsel. *Id.* at 557-558. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding was fundamentally unfair due to the performance of trial counsel. *Id.*, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). Lesser tests of prejudice have been rejected: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Bradley* at 142, fn. 1, quoting *Strickland* at 693.

**{¶73}** As mentioned at the beginning of this topic, the allegations of ineffective assistance of counsel in the fifth assignment of error are related to subjects addressed under the remaining assignments of error. In accordance, we address each allegation under the related assignment of error. For the reasons set forth under those assignments of error, the fifth assignment of error is without merit. There was no error by counsel; nor would the defense have suffered prejudice from the alleged error.

SPEEDY TRIAL

**{¶74}** Appellant's second assignment of error alleges:

"THE TRIAL COURT ERRED IN FAILING TO DISMISS THE INDICTMENT FOR DENIAL OF THE APPELLANT'S CONSTITUTIONAL AND STATUTORY RIGHT TO A SPEEDY TRIAL."

**{¶75}** A defendant charged with a felony "shall be brought to trial within two hundred seventy days after the person's arrest." R.C. 2945.71(C)(2). The day of arrest is not utilized in the count. *State v. Baker*, 2020-Ohio-7023, ¶ 99 (7th Dist.). As Appellant

remained in jail pending trial, triple time applied. R.C. 2945.71(E) ("each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days"). However, the time is tolled for the reasons in R.C. 2945.72, including during extradition. If a motion is "made at or prior to the commencement of trial," then the court shall discharge a person charged who was not brought to trial within the time required by these statutes, which is a bar to further prosecution. Former R.C. 2945.73(B),(D).[5]

{¶76} On August 9, 2023, Appellant filed a motion to dismiss the January 11, 2023 indictment on speedy trial grounds, even though he was not returned to Ohio until May 24, 2023. The motion relied on an argument that speedy trial time started elapsing on January 14, 2023, the day after he was arrested in West Virginia on a fugitive warrant (from Ohio) and requested an extradition hearing. Appellant also claimed a different try-by time applied under the Interstate Agreement on Detainers Act. The defendant's own motion showed the statute was inapplicable and outlined the timely extradition process instituted by Ohio because Appellant did not waive extradition (until May 22, 2023, after which Ohio took custody of him within two days).

{¶77} As the state's response and the trial court's judgment explained, the cited act only applied when the defendant "entered upon a term of imprisonment in a penal or correctional institution of a party state" but a detainer was lodged on an untried indictment in another state and the defendant "caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment" which must be accompanied by a certificate from the warden who shall forward the demand. R.C. 2963.30, art. III(a) (in which case he shall be brought to trial within 180 days of causing the requisite delivery to the prosecutor and court). To the contrary, Appellant did not enter a term of imprisonment in West Virginia, and in any event, the requisite demand was not made.

{¶78} Moreover, it was emphasized the speedy trial clock did not begin to run until after Ohio received physical custody because time was tolled for the time "during which

---

[5] Appellant states the version of R.C. 2945.73 effective April 4, 2023 (with a savings clause if trial occurs within 14 days of the motion) is inapplicable because, although Ohio did not obtain custody of him until May 2023, he was indicted in January 2023 and arrested on a warrant instigated by the Ohio indictment. *See* R.C. 1.58; *see also* R.C. 2945.72(A) (tolling during extradition). The state does not argue otherwise.

the accused is unavailable for hearing or trial . . . by reason of his confinement in another state, or by reason of the pendency of extradition proceedings, provided that the prosecution exercises reasonable diligence to secure his availability." *See* R.C. 2945.72(A). As the state's response to the motion pointed out, when Appellant filed his motion, 90 days had not passed since the day after Ohio received physical custody of him (even without the tolling from June 7 to June 30, 2023, which Appellant admits tolled the time while the state responded to his initial discovery requests). *See State v. Brown*, 2002-Ohio-7040, ¶ 22 (where the Supreme Court held discovery requests by the defendant are tolling events), applying R.C. 2945.72(E); *State v. Owens*, 1996 WL 146097, *4 (7th Dist. Mar. 29, 1996) (starting the clock the day after the defendant is returned to Ohio from another state; essentially recognizing the date of receipt, transport, and is still part of the tolling), applying R.C. 2945.72(A).

{¶79} As Appellant's motion lacked merit, the trial court correctly denied it. The court's rejection of the specific arguments set forth in the motion is not challenged on appeal.

{¶80} *Instead, Appellant contends the trial court erred in stating his motion to dismiss tolled the speedy trial time*. (9/10/24 J.E.). Under Appellant's argument made for the first time on appeal, he contends this statement was erroneous in part. He argues the trial court took an extraordinarily long time (over a year) to rule on his speedy trial motion and thus tolling should not be attributed to the entire time his motion was pending.

{¶81} However, in the contested statement in the speedy trial ruling, the trial court was merely pointing out the end date for the calculation *relevant to the August 9, 2023 motion* being addressed. The court was not purporting to validate the delay for purposes of an argument that was never made or attempting to foreclose a future speedy trial motion. Read in context, it was not inaccurate to say the speedy trial motion tolled the time. In fact, Appellant agrees such a motion tolls the time for some period (for the state's response and for a reasonable time for the trial court to rule under the circumstances).

{¶82} Speedy trial rights are not self-executing but must be asserted in a timely fashion to avoid being waived. *Baker*, 2020-Ohio-7023, at ¶ 107 (7th Dist.) (motion made after trial but before sentencing was untimely), applying R.C. 2945.73(B) (motion to be filed at or prior to commencement of trial). No motion was filed to assert the statutory

speedy trial time expired at some point *after the first motion*. No motion alleged the court took an unreasonable amount of time to rule on the first motion or asserted a broader constitutional speedy trial violation. In ruling on a motion to dismiss under speedy trial, the court does not need to review occurrences after the motion in counting the expired time for purposes of ruling on the arguments in the motion and does not need to sua sponte raise arguments regarding events occurring or not occurring after the motion's filing. The failure to file a new motion (or renew, amend, or refile a relevant motion) on speedy trial after a non-meritorious motion was denied constitutes waiver of later arguments on statutory time elapsing. *See, e.g., id; State v. Smith*, 2024-Ohio-5168, ¶ 28 (4th Dist.) ("we need not consider any time beyond the [initial speedy trial] motion date because Smith did not renew his motion to dismiss").

**{¶83}** Consequently, Appellant contends his trial counsel was ineffective by failing to file a subsequent motion to dismiss on statutory and constitutional grounds after the first motion was denied. (A/E 5). In this desired second motion, Appellant says counsel should have raised the issue of the court's long delay in ruling on the August 9, 2023 speedy trial motion. He says even allowing the trial court the "outer limit" in Sup.R. 40(A)(3) (which provides a mere guideline) of 120 days to rule on a motion and thus tolling the time during that time, the speedy trial time would have expired before the court finally ruled on September 10, 2024.

**{¶84}** However, Appellant's brief fails to discuss the multitude of tolling events occurring after the speedy trial motion was filed. Instead, Appellant observes when a defendant makes a prima facie case by showing the time expired, the trial court can place a burden on the state to show tolling events. We note this does not preclude a court from conducting its own review of filings in the record of the case. *State v. Devine*, 2019-Ohio-778, ¶ 28, fn.1 (7th Dist.). In any event, such a process applicable *in the trial court* on certain factual matters related to tolling (like parole holders), does not relieve an appellant from showing error in the initial brief on appeal, especially when he is arguing ineffective assistance of counsel in failing to make a motion (meaning the state never had a burden to raise tolling events). *See id.* An appellant's initial brief must demonstrate error by reviewing the record and honestly assessing tolling events, not ignoring blatant defense-

initiated tolling events and waiting to reply to arguments on tolling in the state's response brief.

**{¶85}** In any event, the reason neither co-counsel representing Appellant decided to file another speedy trial motion was because his *speedy trial time did not run* (regardless of the appropriate length of tolling attributable to the motion). A week after Appellant filed the speedy trial motion, he filed a motion for expert fees, a request for specific discovery of specified items, *and a motion to continue the September 5, 2023 trial*. *See* R.C. 2945.72(E) (tolling for "Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused"), (H) (tolling for "The period of any continuance granted on the accused's own motion").

**{¶86}** The court granted *Appellant's motion* to continue the trial and reset the trial for February 20, 2024. On February 8, 2024, Appellant filed seventeen motions to suppress, challenging search warrants (one required the judge to conduct an evidentiary hearing, two had to be heard by a different judge, and the other fourteen were filed despite Appellant's lack of standing regarding those warrants). On April 18, 2024, Appellant filed a reply in support. The suppression hearing was set for July 22, 2024.

**{¶87}** In any event, on January 9, 2024, prior to the suppression motions, *the defense moved to continue the February 20 trial date*. The court granted *Appellant's motion to continue* the February 20, 2024 trial date and reset the trial for August 27, 2024. (2/12/24 J.E.). Clearly, all of the time from the speedy trial motion to this reset trial date instigated by Appellant, was attributable to him, and tolled the time.

**{¶88}** In the meantime, Appellant continued to file numerous motions, including a July 15, 2024 request for a *Franks* hearing. Immediately after this motion, the state filed a motion saying both sides believed a continuance of the July 22 suppression hearing was appropriate, which would necessitate a continuance of the trial date.

**{¶89}** The court granted the *joint request for a continuance* of the suppression hearing moving it to August 30, 2024 and pointing out this agreement necessarily required a continuance of the August 27 jury trial date. (7/18/24 J.E.). The suppression hearing took place on the agreed rescheduled date of August 30, 2024 and the court took the matter under advisement.

**{¶90}** Upon the joint continuance, the first available trial date was said to be January 14, 2025, and trial was reset for that date, further continuing the tolling of speedy trial time. (8/12/24 J.E.) (with a final pretrial set for 12/16/24); (8/12/22 Tr. 3); R.C. 2945.72(H) ("The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion").

**{¶91}** Accordingly, contrary to Appellant's main contention, the reasonableness of the delay in failing to rule on his speedy trial motion until September 10, 2024 was irrelevant to the speedy trial time or any timing issue in the case as the time remained tolled for other reasons after the motion was filed.

**{¶92}** Before reaching the continuance of the January 14, 2025 agreed trial date, we note various other occurrences prior thereto. On November 7, 2024, the defense supplemented discovery with tests from their firearm expert, prompting the state to point to deficiencies in the report and the court to schedule a *Daubert* hearing for January 6, 2025. (11/18/24 J.E.). Also, on November 18, 2024, Appellant filed a motion to sever the case from the co-defendant, a motion to transcribe and disclose grand jury testimony, and motion for disclosure of due process material. The state responded to these motions on November 29, 2024. The court then issued its decision denying the suppression motion and the *Franks* request. (12/4/24 J.E.). A week later, Appellant then filed a request for specific discovery. On December 30, 2024, the state amended its response to the severance motion and agreed with Appellant's request due to new evidence regarding the co-defendant resulting in antagonist defenses.

**{¶93}** At the January 6, 2025 hearing, the court made note of a discussion from a prior pretrial. (1/6/24 Tr. 3-4). The prosecutor recited how BCI requested bullet fragments (in addition to the casings they already analyzed), the fragments were delivered to BCI immediately upon request, but BCI did not yet provide this additional analysis. *Id.* at 3. The request for the *Daubert* hearing was then said to be moot and withdrawn due to the defense's formal assertion that they would not be calling their firearm expert. *Id.* at 6-7. A discovery issue was found moot as well. *Id.* at 5. In granting *Appellant's motion* to sever the trials and therefore resetting Appellant's trial for June 24, 2025, the court noted they already picked the trial date; the court asked the attorneys if this was their

understanding to which both of Appellant's defense attorneys answered in the affirmative. *Id.* at 4-6. Later, the state made a point to place on the record, "the dates were selected at the first available opportunity and by agreement." Appellant's counsel replied, "I'm going to agree with that statement, Your Honor." *Id.* at 11.

**{¶94}** A judgment entry memorialized the decisions, including the continuance of the trial date to June 24, 2025 upon the court granting Appellant's motion for severance. (1/16/25 J.E.). The time therefore remained tolled, and the trial did in fact commence on June 24, 2025.

**{¶95}** Contrary to a contention in the reply brief, the state is not arguing there was a speedy trial waiver. Rather, the state is making standard tolling arguments. At the January 6 hearing, a week before trial, the state explained (upon the court's inquiry) that an additional BCI bullet analysis was not complete. This appeared related to the defense retaining a firearm expert, who was not formally withdrawn as a defense witness until this hearing, which withdrawal was said to render the scheduled *Daubert* hearing no longer necessary. Moreover, Appellant's pending motion for severance was granted at the hearing. The granting of a defendant's request to sever would change the parties' trial strategy and necessarily cause a conflict on the court's schedule. *See* R.C. 2945.72(H) ("The period of any continuance granted on the accused's own motion"); *see also State v. Cornelius*, 1989 WL 42988, *3 (12th Dist. May 1, 1989) (continuance of the case necessitated by granting the defendant's severance request delay is caused by and charged to appellant). Regardless, even if it were to be considered a state's request, the continuance was not unreasonable. *See* R.C. 2945.72(H) ("and the period of any reasonable continuance granted other than upon the accused's own motion"). In fact, the defense agreed with the reset trial date, which constituted a reasonable continuance, as it was the first available date regardless of who caused the court to continue the trial.

**{¶96}** Counsel had no duty to file a speedy trial motion that would not have been successful. The failure to file a second speedy trial motion was not deficient performance or prejudicial as the speedy trial time was tolled and did not expire.

**{¶97}** As for Appellant's assertion that trial counsel should have asserted his constitutional right to a speedy trial (in addition to his statutory right), his brief fails to show a constitutional violation. The test is not even cited until the reply brief. When a motion

to dismiss on constitutional speedy trial grounds is filed, the court determines if the delay before trial was reasonable by employing a balancing test on reasonableness and considers factors including: the length of the delay, the reason for the delay, how and when the defendant asserted his right, and any prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). In *Barker*, the United States Supreme Court found no constitutional speedy trial violation where there was an "extraordinary" delay between arrest and trial of well over five years, only seven months of the period was a strong state's excuse, and the defendant spent ten months in jail before trial. *Id.* at 533-534.

**{¶98}** As for the length of the delay, there were 2.5 years between Appellant's indictment (immediately followed by his arrest in another state) and the commencement of trial. Being well over one year, the total delay would weigh on the side of the defendant and serve as the trigger for the remaining analysis. *Id.* at 530; *see also Doggett v. United States*, 505 U.S. 647, 652, fn. 1 (1992).

**{¶99}** In moving to evaluate the reasons for the delay, "different weights are assigned to different reasons." *Id.* at 531 (the state's motive for delay such as to harm the defense may weigh in favor of the defendant while "more neutral reasons" like negligence, a missing witness, or overcrowded courts do not weigh heavily in favor of the defendant). The first 4.5 months of the time was consumed by the pending extradition procedures until Appellant finally waived them. Thereafter, an assigned counsel's failure to move the case forward cannot be attributed to the state. *Vermont v. Brillon*, 556 U.S. 81, 92 (2009) (reversing the Vermont Supreme Court's speedy trial dismissal). The various instances of delay here were either caused by the defense or more neutral in weight.

**{¶100}** Regarding assertion of the right, there was never an assertion of the constitutional right to a speedy trial, while the assertion of the statutory right was unsupported, very early in the case, and followed by a multitude of defense motions.

**{¶101}** The prejudice factor may entail considerations of oppressive pretrial incarceration, anxiety for the defendant, and impairment to the defense. *Id.* at 532. However, a delay in trial "does not per se prejudice the accused's ability to defend himself." *Id.* at 521. "Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their

memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so." *Id.* If, instead of a key witness dying, a new witness comes forth, we do not second-guess counsel's delay strategy. *See id.* at 535 (seeking to take advantage of delay in which he acquiesced in hopes of receiving dismissal in the future).

**{¶102}** There is no reasonable probability a motion to dismiss on speedy trial grounds would have been granted if filed at trial or at any point before that, and the two attorneys who jointly represented Appellant were not deficient in failing to file such a motion. This assignment of error is overruled along with the portion of assignment of error five raising ineffective assistance on speedy trial grounds.

PROSECUTORIAL MISCONDUCT

**{¶103}** Appellant's third assignment of error alleges:

"THE APPELLANT WAS DENIED HIS FUNDAMENTAL DUE PROCESS OF LAW DUE TO PROSECUTORIAL MISCONDUCT."

**{¶104}** Three alleged instances of prosecutorial misconduct are separately set forth under this assignment of error. As the defense failed to object to two of the allegations and failed to move for a mistrial (or other remedy) regarding the third allegation, Appellant raises plain error (in this assignment of error) and ineffective assistance of counsel (in his fifth assignment of error above, where we set forth the test).

**{¶105}** As explained by the Ohio Supreme Court, plain error in a criminal case is a discretionary doctrine the appellate court may employ in exceptional circumstances when required to avoid a manifest miscarriage of justice. *State v. Noling*, 2002-Ohio-7044, ¶ 62, applying Crim.R. 52(B). To establish plain error, a party must show the court committed an obvious error that affected the outcome of the proceeding. *State v. Graham*, 2020-Ohio-6700, ¶ 93; *see also State v. Rogers*, 2015-Ohio-2459, ¶ 22 (for plain error, the appellant "is therefore required to demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims."); *accord Carter*, 72 Ohio St.3d at 557-558 (ineffective assistance claim requires deficient performance with a strong presumption in favor of counsel without second-guessing strategic decisions plus prejudice rendering the result unreliable or the proceeding fundamentally unfair).

**{¶106}** First, Appellant argues the prosecutor improperly expressed a personal opinion about his guilt in the closing argument. Appellant quotes the following small portion of the summation: "as you see for every charge, including the specifications, the state has met its burden. Frankly, I would submit to you *I don't believe there is any doubt in this case*. But there's absolutely no reasonable doubt on who committed this crime." (Emphasis added by Appellant) (Tr. 881-822).

**{¶107}** In evaluating a claim of prosecutorial misconduct in closing arguments, a court asks whether the comments were improper and, if so, whether they prejudicially affected the defendant's substantial rights. *Noling* at ¶ 91. "[T]he prosecution is entitled to a certain degree of latitude in summation." *State v. Treesh*, 90 Ohio St.3d 460, 466 (2001). "The prosecutor may draw reasonable inferences from the evidence presented at trial, and may comment on those inferences during closing argument." *Id.*

**{¶108}** "[I]solated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *Noling* at ¶ 94. "Rather, an appellate court must review a closing argument in its entirety to determine whether prejudicial error exists." *Id.* Additionally, the court's jury instructions have been viewed as negating any prejudicial effects. *Id.* at ¶ 95. Here, we note the court instructed the jury that closing arguments are not evidence and they were the sole judges of the facts, credibility of witnesses, and weight of the evidence. (Tr. 928-930, 933).

**{¶109}** The state cites a case observing although a prosecutor must proceed with care when referencing a defendant's guilt in closing argument, the prosecutor is permitted to comment on evidence and suggest conclusions that can be drawn from the evidence. *State v. Hale*, 2004-Ohio-6943, ¶ 49 (11th Dist.) (opining the prosecutor may say, "I believe the evidence has shown the defendant's guilt" but may not say, "I believe the defendant is guilty" without a reference to the evidence); *see also State v. Perkins*, 2005-Ohio-6557, ¶ 29 (12th Dist.) (finding no issue with the state's closing comment, "when you put it altogether [sic], there is only one scenario that happened").

**{¶110}** Moreover, this court found no plain error where a defendant argued prosecutorial misconduct occurred when the prosecutor commented in closing that the evidence demonstrated the defendant assaulted the victim. *State v. Vich*, 1999 WL 439019, *6 (7th Dist. June 25, 1999). We concluded the prosecutor's statement "was not

unfounded, but rather, was supported by the testimony presented at trial." *Id.* (and concluding the totality of the testimony and entirety of the closing argument showed the defendant was not deprived of a fair trial and a miscarriage of justice did not occur).

{¶111} In doing so, we pointed to the Ohio Supreme Court's observation: "A prosecutor may not express his personal opinion about the guilt of the accused, *unless he bases that opinion on the evidence presented in court*." (Emphasis added.) *State v. Keenan*, 66 Ohio St.3d 402, 408 (1993) (also noting prosecutorial misconduct is reversible only in a rare case). Appellant cites the Court's general observation about it being "improper for an attorney to express his personal belief or opinion as to . . . the guilt of the accused." *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). Yet, the Supreme Court's above-quoted statement in *Keenan* was issued later and was more specific. *Keenan* at 408.

{¶112} In addition, the Supreme Court subsequently confirmed: "Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn from the evidence. A prosecutor may state his or her opinion if it is based on the evidence presented at trial." *State v. Diar*, 2008-Ohio-6266, ¶ 213; *see also State v. Keene*, 81 Ohio St.3d 646, 666 (1998) (finding waiver due to lack of objection but opining the prosecutor's description of a witness as "one of the best witnesses any of us has seen in quite awhile" was not improper vouching for credibility as the prosecutor may factually say testimony was supported by evidence bolstering their credibility).

{¶113} Here, the prosecutor recapped all of the evidence, spoke of the burden, and then essentially said the evidence supported a conclusion beyond a reasonable doubt (or any doubt) that Appellant was guilty of the offense. (Tr. 855-883). The mere fact a prosecutor uses the phrase "I believe" or here "I don't believe" in regards to the meeting of the evidentiary burden does not automatically mean the prosecutor is expressing a personal opinion of the accused's guilt untethered to the evidence presented. As the state points out, a few lines after the contested comment, the prosecutor explained the comment was based on "all of the evidence found, collected, and discovered" that points to Appellant.

{¶114} Viewing the contested comment in context and as a piece of the entirety of the closing rather than as an isolated comment, the trial court did not commit plain error

by failing to sua sponte ask the prosecutor to refrain from using the word I in conjunction with the word believe and to use less personal phraseology (such as "it is submitted that" or "you can conclude"). Likewise, Appellant's defense attorneys were not deficient for failing to object to the comment; i.e., they committed no error. *See, e.g., State v. Worley*, 2021-Ohio-2207, ¶ 112-113 (where the Ohio Supreme Court found no deficient performance by failing to object to a closing statement, "Her death was purposely caused," as it was made in the context of discussing the evidence giving rise to reasonable inference). Moreover, the lack of objection did not prejudice the defense. Accordingly, this allegation of prosecutorial misconduct addressed through plain error and ineffective assistance of trial counsel is without merit.

{¶115} Next, we address Appellant's contention that the prosecutor improperly invited the lead detective to express his opinion on Appellant's veracity by asking if certain statements Appellant made to the detective were determined "to be a lie." Appellant quotes the prosecutor's questions to the detective about the evidence being at odds with Appellant's statements about his mother being on a trip at the time of the homicide, he was home with his girlfriend, and he did not have her phone number. (Tr. 757-760). Appellant also points to a recap made by the prosecutor while asking the detective to identify Appellant. *Id.* at 807 ("the individual you interviewed, who lied to you multiple times, who you've been investigating in this case, is he in the courtroom today?").

{¶116} Appellant's argument relies on law stating the jury occupies the exclusive role on witness credibility. He cites a case where a pediatrician provided an expert opinion vouching a child victim's declaration of sexual abuse was not fabricated by the child or the product of coaching. *See State v. Boston*, 46 Ohio St.3d 108 (1989), syllabus; *but see State v. Stowers*, 81 Ohio St.3d 260, 263 (1998) (*Boston* "does not proscribe testimony which is additional support for the truth of the facts testified to by the child, or which assists the fact finder in assessing the child's veracity").

{¶117} Here, however, the detective was not testifying as an expert when relaying what Appellant told him and why it was contradicted by the other evidence. The detective was not asked to opine whether Appellant was an untruthful person or was lying in the detective's personal opinion. The detective was attempting to testify about why the evidence did not corroborate specific statements by Appellant, and he was asked whether

those statements would be untrue under the evidence collected, confirmed, and presented to the jury. Other testimony was presented by the detective and by other witnesses establishing the evidence that conflicted with Appellant's statement.

{¶118} As the state notes, Appellant was not a witness but was a non-testifying defendant. Furthermore, we have previously distinguished the situation in *Boston* and explained an investigating officer is permitted to testify a defendant's pretrial statement did not appear to be true because it was inconsistent with the evidence collected. *State v. Mitchell*, 2008-Ohio-1525, ¶ 16-28 (7th Dist.) (the detective's opinion "was a description of the defendant's own statement, which was admissible as a statement of a party opponent, and the investigating detective's opinion as to whether the evidence he collected corroborated the statement [which] evidence was viewed by the jury as well."), citing *State v. Watkins*, App. No. 77051 (8th Dist. Sept. 7, 2000) (an officer can testify as a lay witness that he believed the defendant was lying in his statement due to inconsistent answers).

{¶119} The detective's testimony was rationally based on his own perception and helpful to a clear understanding of his testimony or to the determination of a fact in issue. *See* Evid.R. 701. "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Evid.R. 704.

{¶120} The trial court did not plainly err by refraining from sua sponte asking the prosecutor to discontinue asking the detective if various statements made by Appellant were untrue. Moreover, Appellant's defense attorneys did not create error by failing to lodge objections. The defense may have refrained from objecting because the content of the detective's answers was not objectionable to them or the defense tactically did not wish to draw attention to the matter by objecting to the wording used by the prosecutor and thereby appear to the jury to be irrationally arguing that Appellant's statements were not at odds with evidence collected. To the extent one could surmise the detective was essentially being asked to vouch for certain witnesses who provided statements contrary to Appellant's statement, their statements had been confirmed by Appellant's own phone, and the defense could have strategically wished to ensure all parts of Appellant's statement were introduced by the state. His statement may not have been placed into

evidence had the defense started objecting to the language used in eliciting testimony on how Appellant's statement was at odds with the evidence. *See* Evid.R. 801(D)(2) (defendant's pretrial statement constitutes an admission by a party opponent that can only be presented by the state at trial).

**{¶121}** Even assuming, upon timely defense objection, the trial court may have asked the prosecutor to tone it down and rephrase a question, the statements were not prejudicial. The evidence collected and presented was confirmed to be at odds with Appellant's relevant statements. Regardless, as stated above, counsel did not err in failing to object. This allegation of prosecutorial misconduct through plain error and ineffective assistance of counsel is without merit.

**{¶122}** Lastly, we address Appellant's allegation the prosecutor committed misconduct by failing to disclose impeachment evidence until mid-trial in violation of due process and discovery rules. The state violates a defendant's due process rights if it "withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 565 U.S. 73, 75 (2012), citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963). A *Brady* violation occurs if: (1) the state withheld evidence (either willfully or inadvertently); (2) the evidence is favorable to the accused (whether tending to exculpate or impeach); and (3) the evidence is material under the standard prejudice test, which asks whether there is a reasonable probability the result would have been different if the evidence was disclosed to the defense. *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999); *Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995).

**{¶123}** Initially, the state points to the observation that *Brady* applies to post-trial discovery of exculpatory or impeachment information, not pretrial or midtrial discovery. *See State v. Wickline*, 50 Ohio St.3d 114, 116 (1990) (adding emphasis to the following quote: "The rule of *Brady* . . . arguably applies in three quite different situations. Each involves the discovery, *after trial*, of information which had been known to the prosecution but unknown to the defense"), quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976). Although "strictly speaking, *Brady* is not violated when disclosure occurs during trial, . . . a trial court has authority, pursuant to Crim.R. 16(E)(3), to grant a continuance or make other orders that the court deems just to ensure that the recently disclosed information can be evaluated, and used at defense counsel's option, before the trial is concluded."

*State v. Iacona*, 93 Ohio St.3d 83, 100 (2001). Still, the Court noted courts have recognized, "the philosophical underpinnings of *Brady* support the conclusion that even disclosure of potentially exculpatory evidence during trial may constitute a due process violation if the late timing of the disclosure significantly impairs the fairness of the trial." *Id.*; *but see State v. Hanna*, 2002-Ohio-2221, ¶ 82 (where the Supreme Court refused to address a prosecutorial misconduct allegation under *Brady* principles where the report was presented *during* trial).

{¶124} A due process claim realized at trial must be raised to the trial court with a request to exclude the evidence or to dismiss the case based on a due process violation. *State v. Murphy*, 2022-Ohio-4555, ¶ 38 (7th Dist.) (no plain error or ineffective assistance). If the defense makes a mistrial motion, the denial rests in the sound discretion of the trial court and is not disturbed absent an abuse of discretion. *Iacona* at 100. As emphasized by the state, "a mistrial is an extreme remedy only warranted in circumstances where a fair trial is no longer possible and it is required to meet the ends of justice." *State v. Bigsby*, 2013-Ohio-5641, ¶ 58 (7th Dist.) (mere irregularity does not warrant a mistrial where substantial rights are not adversely affected).

{¶125} When Allen Tisdale provided his statement to police admitting he was the lookout and witnessed Appellant and Holland commit the shooting, he also indicated what they did directly after the shooting. In his statement and at trial, Allen said after stopping at a house where Appellant knew a man who could dismantle or dispose of the guns, they drove to a house in downtown East Liverpool where they burned their clothing in a fire pit and took long showers. *Id.* at 573-576.

{¶126} In the December 2024 statement, Allen said this second house was where a girlfriend of Appellant lived. *Id.* at 593-594. At the June 2025 trial, he said it was actually the house of another Tisdale cousin (R.T.). *Id.* at 575-576. On cross-examination, Allen acknowledged the portion of his statement substituting his cousin's house with a girl's house was a lie. *Id.* at 594. On redirect, he explained he was "concerned about bringing [his noninvolved cousin] into all of this" but was now telling the truth. *Id.* at 596.

{¶127} When the detective was being cross-examined about this topic, the defense became aware that Allen informed the prosecution the second house was the residence of R.T. during trial preparation with prosecutors. *Id.* at 810-812. The court

asked if the defense wished to voice an objection or note a concern. The defense claimed the matter was a substantive change that was unfairly not disclosed before trial. *Id.* at 811-812. The state argued: the defense already cross-examined Allen on and impeached him with this cited change to his statement; it was not exculpatory to Appellant; the December 2024 supplemental police report provided to the defense in discovery indicated the detective believed Appellant was talking about R.T.'s house rather than the house of one of Appellant's girlfriends who lived "a couple houses down"; the report also referred to viewing the fire pit in the backyard of R.T.'s house; R.T. was named as a witness; and the state provided a photograph of the fire pit to the defense two weeks before trial. *Id.* 812-813, 822-825. Thereafter, in admitting exhibits, there was no objection to the photograph of the fire pit in R.T.'s backyard. *Id.* at 832.

{¶128} The defense did not move for a remedy in complaining about the matter, but Appellant now argues the lack of action by the court constituted plain error (under assignment of error three) and the failure to move for mistrial constituted ineffective assistance of counsel (under assignment of error five). Considering the totality of the circumstances, the court did not err in failing to sua sponte create a remedy, and counsel did not err in failing to seek a mistrial. Moreover, there was no prejudice from the alleged misconduct or from the failure to move for a mistrial.

{¶129} It was not until trial preparation that Allen acknowledged the house where they burned clothes and took a shower was R.T.'s house; however, the detective's belief that R.T.'s house was the relevant location was disclosed in discovery long before trial. The defense received a supplemental police report wherein the police expressed the belief the group actually went to R.T.'s house where a fire pit could be seen (rather than to the house of R.T.'s neighbor whom Appellant dated). Disclosed text evidence also supported this. No evidence was recovered from R.T.'s former house. R.T. was not cooperative and did not testify but was listed as a witness. Moreover, the defense received a photograph of the fire pit weeks before trial. Finally, the defense thoroughly cross-examined Allen Tisdale regarding the change in his statement about who lived at the second house they went to after the shooting.

{¶130} The three arguments encompassing plain error and ineffective assistance of counsel with regards to prosecutorial misconduct are without merit. The trial court did

not err; nor did defense counsel. Appellant's third assignment of error and the portion of the fifth assignment of error related to this assignment are overruled.

CONFRONTATION CLAUSE

{¶131} Appellant's fourth assignment of error contends:

"THE APPELLANT'S FUNDAMENTAL CONSTITUTIONAL RIGHT TO CONFRONT THE WITNESSES AGAINST HIM WAS VIOLATED."

{¶132} A statement may violate a defendant's constitutional right to confront witnesses if it is "testimonial and the defendant has had no opportunity to cross-examine the declarant." *State v. Arnold*, 2010-Ohio-2742, ¶ 13, citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The confrontation clause does not exclude a testimonial statement utilized for a purpose other than establishing the truth of the matter asserted. *State v. Maxwell*, 2014-Ohio-1019, ¶ 131 (out of court statement to prove the effect on the listener), citing *Crawford* at 59, fn. 9. In addition, the confrontation clause does not apply to non-testimonial statements, and thus, a statement will not be evaluated under the confrontation clause unless the primary purpose of the statement or the police interrogation was to gather evidence (and create an out-of-court substitute for trial testimony). *Ohio v. Clark*, 576 U.S. 237, 244-251 (2015) (an ongoing emergency is not the only example of a non-testimonial statement, and "the primary purpose test is necessary, but not always a sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause").

{¶133} Based on *Crawford*, the witness who conducted the analysis of substantive evidence must testify to introduce the evidence. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311-312 (2009) (certificate showing results of forensic analysis of substance was testimonial); *Bullcoming v. New Mexico*, 564 U.S. 647, 661-663 (2011) (state improperly used a "surrogate" analyst who was familiar with testing in the lab to introduce a report certifying blood alcohol content instead of presenting testimony from the analyst who actually conducted the analysis and created the report). The Court pointed out, however, this does not mean anyone whose testimony is relevant to the accuracy of the testing must be called by the state where the person conducting the analysis testified. *Melendez-Diaz* at 311, fn. 1.

{¶134} Appellant claims the state introduced an expert opinion through the detective's testimony even though the consulted expert did not testify. The detective testified he uploaded cell phone data relevant to the phone numbers of both Appellant and Allen Tisdale to digital forensic programs he uses for analyzing CSLI (cell site location information). He said he had special training but was not an expert on the technology, explaining one need not be an expert to use the programs. *Id.* at 792, 819-820. One program (ZetX) allows the data to be viewed through Google Earth, plotting the tower locations from which the cell phone pinged and estimating the phone's location at those particular times. (Tr. 790-792). He also used another program (CASTViz) to plot the CSLI in this case. *Id.* at 792-793. To further verify the data, he obtained collection equipment from ZetX and did a "drive test" for six hours around the relevant East Liverpool areas and uploaded the data for confirmatory plotting. *Id.* at 793-794. The detective came to the conclusion that the phones were in the East End at the time of the murder and in the subsequent locations provided by Allen Tisdale, and the detective made a slideshow for presenting his conclusions on the CSLI to the jury (St.Ex. 81).

{¶135} At issue here is the answer to the following question the prosecutor asked the detective, "Now, after you put the information into ZetX, and you did the drive test, did you have that information peer-reviewed by anybody else?" *Id.* 794. Appellant's *assignment of error challenges the following answer*:

> Yes, I actually had the - - talked to a subject matter expert at ZetX, and just asked if he could confirm that he saw the same thing that I did, and he confirmed it appeared that the cellular was in the East End area of East Liverpool.

*Id.* at 794- 795. There was no objection or motion to strike the answer.

{¶136} On appeal, Appellant claims the disclosure of this confirmation constituted the presentation of a testimonial statement from a ZetX expert/employee whom the defense could not cross-examine. Appellant notes there was no ongoing emergency at the time and claims the detective's primary purpose of asking for the employee's opinion was to establish past events for later prosecution.

{¶137} The state says a witness' testimony that he had his report peer-reviewed is not considered testimonial. *See State v. Hashi*, 2020-Ohio-177, ¶ 62-65 (5th Dist.)

Case No. 25 CO 0024

(finding the challenged statements refer to the review procedure, how a review occurs, or what others did, "not what they said"); *State v. Glenn*, 2016-Ohio-1447, ¶ 25 (5th Dist.) (finding the peer-reviewer "did not independently look at the evidence and reach the same conclusion" but "simply reviewed the finished report for error" and the unobjected-to evidence was merely cumulative and not outcome-determinative). The state also emphasizes the prosecutor's question did not seek an opinion by an expert but was merely asking if the detective's conclusion was peer-reviewed.

{¶138} Notably, the detective conducted his own analysis, came to his own conclusions, generated a slideshow, and testified about his conclusions at trial. This was his work product and was not created by the later-consulted employee of a company whose program was one of the programs the detective used. In other words, it was the detective who did the work to arrive at the conclusions, not the person asked for confirmation thereafter.

{¶139} In any event, there was no objection to the detective's reference to seeking a software employee's confirmation of the detective's own conclusion derived from his use of the program on which he was trained. The detective's answer did not constitute plain error by the trial court, as alleged in the fourth assignment of error, and this is not an exceptional case. Nor did the lack of objection by his two trial attorneys constitute ineffective assistance of counsel, as alleged in the fifth assignment of error. They did not seriously err by failing to object but could reasonably decide to refrain from drawing attention to the detective's disclosure and avoid giving the jury the impression it was an important fact sought to be hidden. *State v. Hartman*, 93 Ohio St.3d 274, 296 (2001) (common tactical decision to refrain from objecting, even to avoid appearing bothersome to jury). We also point out Allen Tisdale's phone location was being discussed by the detective as well, and the defense was hoping the jury would conclude he was the second shooter (in addition to Holland) rather the lookout as he claimed.

{¶140} Moreover, although Appellant's location was a key issue, there was no reasonable probability the one sentence of testimony raised on appeal affected the result or rendered the proceeding unfair. The fact that the detective asked for something he considered peer-review is merely a reflection of a common standard procedure required as part of a policy of best practices in a field; the fact that he mentioned the reviewer was

an expert at the company who came to the same conclusion was not outcome determinative. The detective used two different programs to plot the data as trained. He conducted yet another confirmation by physically driving the routes with a data collection device transmitting his location information to one of the programs. And, an eyewitness placed Appellant in the relevant locations as well. Regardless, as stated above, his two experienced defense attorneys were not deficient in failing to object. This argument is overruled.

CUMULATIVE ERROR

{¶141} Appellant's sixth and final assignment of error provides:

"APPELLANT'S CONVICTION MUST BE REVERSED BASED ON CUMULATIVE ERROR."

{¶142} Appellant broadly cites to the prior assignments of error and concludes if we find more than one error but find each insufficient to require reversal by itself, then the combination of irregularities would cumulatively rise to the level of reversible error. As the state points out, the speedy trial assignment of error would not be relevant here due to its nature of not being subject to a harmless error analysis.

{¶143} Under the cumulative error doctrine, a conviction may be reversible when a reviewing court is convinced the cumulative effect of errors in a trial deprived the defendant of a fair trial, even though each instance of error was individually found harmless. *State v. McKelton*, 2016-Ohio-5735, ¶ 321-322. A cumulative error analysis cannot be commenced if there were not *multiple instances of error* that were individually found harmless. *State v. Hunter*, 2011-Ohio-6524, ¶ 132. There were not multiple instances trial court or defense counsel error found here (and thus not multiple errors labeled harmless). (A/E 1-5).

{¶144} Even if a court finds multiple instances of harmless error, those harmless errors "cannot become prejudicial by sheer weight of numbers." *McKelton* at ¶ 322, quoting *State v. Hill*, 75 Ohio St.3d 195, 212 (1996). "[T]here can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial." *Hill* at 212, quoting *United States v. Hasting*, 461 U.S. 499, 508-509 (1983). Assuming arguendo more than one contention could be considered an error, there would still be no indication such instances would combine to cause reversible prejudice under the

circumstances of the case. We conducted a thorough review of the evidence in our Statement of the Case and within alternative arguments under various assignments of error. Appellant received a fair trial. This assignment of error is overruled.

**{¶145}** For the foregoing reasons, Appellant's convictions are upheld, and the trial court's judgment is affirmed.

Waite, P.J., concurs.

Hanni, J., concurs.

[Cite as *State v. Tisdale*, **2026-Ohio-2567.**]

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**